*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

NATHANIEL CHRISTOPHER JONES,

      Defendant-Appellant.

UNPUBLISHED
June 30, 2022

No. 357917
Wayne Circuit Court
LC No. 17-002951-01-FC

Before: MARKEY, P.J., and SHAPIRO and PATEL, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted[1] his jury trial convictions of assault with a dangerous weapon (felonious assault), MCL 750.82, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[2] Defendant was sentenced to three years' probation for the felonious assault conviction and two years' imprisonment for the felony-firearm conviction. We affirm.

This case arises out of the assault of JS—a minor at the time of the incident—on March 16, 2017, in Detroit. JS testified that on that date at approximately 2:30 p.m. he was present outside the house of Jakina Nelson, whom JS referred to as his aunt even though she was not his biological aunt. Defendant's mother, Lakeesha Webb, lived in Nelson's house and was also present at the time. According to JS, when he had first arrived at the house, Nelson and defendant were in a vehicle parked in front of the home. JS knocked on the front door of the house, at which point defendant rolled down the car window and asked JS his name. JS responded while walking toward the vehicle, and defendant then told JS that he "can't come back over" anymore. JS testified that

---

[1] *People v Jones*, unpublished order of the Court of Appeals, entered September 28, 2021 (Docket No. 357917).

[2] Defendant was acquitted by the jury of assault with intent to commit murder, MCL 750.83, and assault with intent to do great bodily harm less than murder, MCL 750.84.

he waved off defendant with his hand and walked back toward the front door and porch of the house.

JS testified that defendant exited the vehicle and walked toward JS until the two were approximately four or five feet apart. JS was on the sidewalk at this time. JS testified that defendant told him that he would give JS an opportunity to hit defendant and that afterward defendant was going to kill him. JS claimed that he said nothing in reply. But JS later testified that he and defendant both started yelling during the altercation. JS maintained that he and defendant were now only standing two to three feet apart and that he, JS, was nervous. JS unzipped his jacket and struck defendant in the face with his backpack, which contained clothes. Within seconds of being struck in the face, defendant pulled out a gun from his hip area and fired toward JS. JS asserted that defendant had pointed the gun at JS's stomach. JS then ran away and heard another gunshot as he was running. No shots struck him. JS denied seeing defendant having trouble walking or using a cane before the altercation.

JS went to the home of another aunt, and police arrived shortly thereafter to take him back to Nelson's house. JS testified that once there he made a statement to the police identifying defendant as the shooter. Defendant was arrested at the scene. JS indicated that defendant was not bleeding when the police brought JS back to Nelson's house.

Defendant testified that he was at Nelson's home and that he had fired his gun. Defendant stated that JS did not live there at the time and had been asked to leave and not return. Defendant explained that he had been diagnosed with Guillain-Barre syndrome in January 2015 and was hospitalized for seven months. Defendant claimed that he had to relearn how to walk, run, talk, and write because of his condition. He was prescribed medication for his illness, which he was still taking at the time of trial. Defendant also asserted that at different times he utilized a cane, a walker, and a wheelchair due to his medical issues. He testified that he had problems with "leg movement" and had diminished lung capacity. Defendant weighs 330 pounds and stands 6 feet, 4 inches tall.

With regard to the charged assault, defendant indicated that he was sitting in the driver's seat of a car with Nelson and observed JS walking up the pathway to Nelson's front door. Defendant contended that he did not know JS. He asked JS to come over to the car in order to speak with him. JS, however, proceeded to walk up onto the porch of the house. Defendant then exited the vehicle, and JS turned away from the porch. According to defendant, the two engaged in a conversation that began cordially. But when Webb arrived, both Webb and JS began yelling at defendant. Defendant asserted that he never yelled during the encounter. Defendant acknowledged that JS was much smaller than he.

Defendant testified that he told Webb that he was not trying to disrespect her son. Defendant denied stating that JS could hit him or that he was going to kill JS. Defendant maintained that while he was looking at Webb, defendant was "blindsided" with a backpack wielded by JS. Defendant explained that the items in the backpack felt "heavier than clothes" and that the blow impacted his vision. Defendant indicated that he grew afraid after being struck with the backpack. Defendant testified that JS next punched defendant in the chest, causing defendant to fall backward onto a vehicle parked in the driveway. Defendant stated that he first discharged his firearm as he was falling onto the car. Defendant claimed that JS started to run, but after

-2-

running approximately 20 feet, JS then stopped and reached into his jacket. At that point, defendant fired into the dirt, and JS dropped his jacket in the street and ran away. Defendant remained at the scene and called 911. Defendant was not bleeding and did not suffer any bruises or broken bones. Defendant admitted speaking with Nelson by phone while he was at the Detroit Detention Center and acknowledged that he may have told her not to come to court.

Webb testified that she was residing with her friend Nelson at the time of the incident. Webb believed that JS was welcome at Nelson's house. On the date of the assault, JS knocked on the door, and Webb answered it. According to Webb, JS indicated that Nelson's boyfriend wished to speak with him, and Webb told him to close the door while she remained inside the house. Webb again opened the door after hearing "a lot of commotion." Webb testified that she heard defendant saying, "Don't come back over here." She then observed defendant "spinning"[3] in JS's face and saw JS on the sidewalk protecting himself with his backpack. Webb maintained that defendant spoke to JS with a hostile attitude and a raised voice. Webb asserted that defendant told JS, "I want to grant you two swings and then I'm going to kill your ass." JS then took off his jacket and swung his backpack at defendant, although Webb was unsure if the backpack actually struck defendant. Webb testified that defendant pulled a gun from his right hip area, pointed it at JS, and shot at him. JS then started running across the street. Webb testified that she stepped off the porch and that defendant fired his gun two more times. Webb called 911 after JS ran away. Webb did not observe defendant using a cane or having trouble walking at the time.

Testimony by police officers indicated that they could only find physical proof of two shots being fired, that they did not recall observing defendant using a cane or having balance issues, that defendant was not bleeding, that defendant had no visible injuries, and that a backpack was seen but not examined. Defendant was convicted of felonious assault and felony-firearm. The jury acquitted defendant of the more serious assault charges.

On appeal, defendant first argues that the evidence was insufficient to sustain the conviction of felonious assault. Defendant contends that JS admitted to first striking defendant with the backpack. Defendant asserts that he did not draw his gun until JS attacked him. Defendant maintains that "[t]he sequence of events in this matter do not support a case of felonious assault by [defendant], rather this case is about whether [defendant] acted in self-defense after being attacked[.]" Defendant also argues, without any elaboration, that there was insufficient evidence that he committed a battery.

In *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020), this Court articulated the well-established principles that govern our review of a sufficiency argument:

> This Court reviews de novo whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the

---

[3] We believe this to be a typo and that perhaps Webb actually said "spitting," but it ultimately plays no role in our resolution of this appeal.

essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

"The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999) (citation omitted). "An assault may be established by showing either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005) (citation omitted). In this case, the trial court instructed the jury in a manner consistent with these elements and principles, which are set forth in M Crim JI 17.9. Defendant argues, in part, that "[t]here was insufficient evidence for the jury to find beyond a reasonable doubt that [defendant] committed a battery . . . ." As reflected in the caselaw and M Crim JI 17.9, proof of an actual battery is not necessary to establish the crime of felonious assault; consequently, defendant's argument fails. Moreover, JS's testimony that defendant shot in his direction provided evidence sufficient to show that defendant attempted to commit a battery or an unlawful act that placed JS in reasonable apprehension of receiving an immediate battery.

With respect to the self-defense component of defendant's insufficiency argument, the trial court instructed the jury on self-defense pursuant to M Crim JIs 7.15 (Use of Deadly Force in Self-Defense) and 7.16 (Duty to Retreat to Avoid Using Force or Deadly Force). Defendant does not challenge the jury instructions. MCL 780.972 provides, in pertinent part:

(1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

Once a defendant injects the issue of self-defense and satisfies the initial burden of producing some supporting evidence, as here, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *People v Reese*, 491 Mich 127, 155; 815 NW2d 85 (2012); *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010).

In this case, the trial court properly instructed the jury that "[t]he defendant does not have to prove that he acted in self-defense[;] [i]nstead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self-defense." Consistently with M Crim JI 7.15(3)-(5) and

MCL 780.972(1)(a), defendant had to have honestly and reasonably believed that he was in danger of being killed or seriously injured when he fired his weapon and not simply facing the threat of a minor injury; he was only allowed to use as much force as believed reasonably necessary to protect himself. JS's testimony provided evidence that defendant shot at him after being hit in the face with a clothes-filled backpack and then fired again while JS was running away. Viewing this evidence in a light most favorable to the prosecution and resolving all evidentiary conflicts in favor of the prosecution, a rational juror could have found beyond a reasonable doubt that defendant did not act under an honest and reasonable belief that he was in danger of being killed or seriously injured but only faced a threat of or sustained a minor injury. This is especially true with respect to discharge of the firearm when JS was running away. Accordingly, there was sufficient evidence to support the felonious assault conviction.[4]

Defendant next argues that there were two instances of ineffective assistance of counsel. During jury deliberations, the trial court received a note from the jurors, and the court addressed the note on the record before the jury:

> So the Court received a question, "Can we hear more about the Guillain-Barre syndrome?" And I'm going to refer you to jury instruction 3.5, evidence, where it states, "When you discuss the case and decide on your verdict, you may only consider the evidence that has been properly presented admitted in this case." And so you're only to consider the testimony that came in, the exhibits that were introduced in deciding that case and that is all. All right? Any other questions?

The trial court released the jurors for the day after responding to the question, and court was reconvened the next day, at which time jury deliberations continued. The trial court read a second note soon after deliberations had resumed:

> We received a note at 9:50 a.m. and it's actually a request. "Can we see the transcript of the defendant's testimony?" I'm going to bring them out and instruct them to rely on their collective memory as to that testimony. It would take days to get the transcript.

When the trial court then asked, "All right?," defense counsel responded, "That's fine." The court then instructed the jurors as follows:

> We received your note and it appears you're asking for the transcript of the defendant's testimony. I'm going to ask that you rely on your collective recollection of what the testimony is. It would take days if not at least a week to get the transcripts done even if I were to order it. And so you all had the ability to take

---

[4] We note that defendant does not challenge the sufficiency of the evidence relative to the conviction of felony-firearm, which conviction can stand on its own even had defendant been acquitted of felonious assault. See *People v Goree*, 296 Mich App 293, 304; 819 NW2d 82 (2012) (a jury need not convict a defendant of the charged underlying felony in order to convict the defendant of the crime of felony-firearm).

notes. Hopefully, you all took some notes about that, but I would ask you to rely on your collective recollection of what that testimony is. Okay?

An hour and 43 minutes later the jury returned with its verdicts.

On appeal, with respect to the matter concerning Guillain-Barre syndrome, defendant complains that trial counsel failed to object to the court's response to the jury's question and that counsel was ineffective by failing to present medical testimony and evidence regarding the syndrome. Defendant contends:

> The defense presented no appreciable medical evidence of Guillain-Barre syndrome and how it affected [defendant's] physical condition that could have had a bearing on his state of mind when he was attacked by [JS] in relation to whether he had an honest and reasonable belief that he was in danger of being seriously injured due to his inability to physically defend himself due to a weakened physical condition and loss of strength wrought by the disease he had long suffered from.

With respect to the jury's request for a transcript of defendant's testimony, defendant argues that trial counsel was ineffective for waiving any challenge to the trial court's handling of the jury's question. Defendant maintains that the trial court's response to the jury's question violated MCR 2.513(P) because the court did not allow for the possibility of providing the transcript later if the jury again determined that it needed to review defendant's testimony. Defendant further argues that trial counsel's waiver of the issue deprived him of a more careful review of his testimony by the jurors and of "the exact sequence of events according to the defendant's perspective."

Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), our Supreme Court recited the principles governing a claim of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Quotation marks and citations omitted.]

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). A decision regarding whether to call or question an expert witness is presumed to be a matter of trial strategy, and we will not substitute our judgment for that of counsel concerning matters of trial strategy so long as reasonable professional judgment supported counsel's choice. *People v Posey*, 334 Mich 338, 352-353; 964 NW2d 862 (2020).

With respect to ineffective assistance claims, "[w]hen a defendant did not move in the trial court for a new trial or an evidentiary hearing, this Court's review is limited to mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Defendant did not move for a new trial or a *Ginther*[5] hearing in the trial court, and he did not move in this Court to remand the case for a *Ginther* hearing. Furthermore, in his brief on appeal, defendant does not make any argument requesting a remand to file a motion for new trial or for a *Ginther* hearing. Accordingly, we will only consider the existing record for purposes of defendant's argument that he was denied the effective assistance of counsel.

With respect to the failure to call a medical expert regarding Guillain-Barre syndrome, we conclude that defendant has failed to establish the factual predicate for his claim and has also failed to demonstrate the requisite prejudice assuming deficient performance. Defendant testified that he suffers from Guillain-Barre syndrome, that he was hospitalized for seven months, that he had to relearn how to walk, run, talk, and write, that at different times he utilized a cane, a walker, and a wheelchair due to his medical condition, and that he had problems with "leg movement" and had diminished lung capacity. We have absolutely no record evidence or information with regard to what a medical expert on Guillain-Barre syndrome would testify to on the stand. Defendant contends that the testimony from a medical expert would have assisted in showing that he acted honestly and reasonably in discharging his weapon. But without record support this is pure speculation on defendant's part. An expert could potentially have called into question or undermined defendant's own claims in regard to how severely Guillain-Barre syndrome purportedly impacted him. It must be kept in mind that trial counsel obtained not-guilty verdicts on two more serious assault offenses, and the felonious assault conviction resulted in a sentence of only three years' probation. Because it is impossible to discern from the record whether testimony by an expert on Guillain-Barre syndrome would have benefited the defense, we cannot conclude that defendant has demonstrated that there exists a reasonable probability that but for counsel's assumed error the result of the proceeding would have been different.

With respect to the jury's request for a transcript of defendant's testimony, MCR 2.513(P) provides:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence that has not been allowed into the jury room under subrule (O), the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may make a video or audio recording of witness testimony, or prepare an immediate

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

transcript of such testimony, and such tape or transcript, or other testimony or evidence, may be made available to the jury for its consideration. The court may order the jury to deliberate further without the requested review, as long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

Here, the trial court's response could reasonably be construed as foreclosing on the possibility of the jurors' having an opportunity to review defendant's testimony at a later time. Consequently, even if the jury's request were unreasonable, the court should have informed the jury that the matter could be revisited if necessary. That said, we conclude that defendant has failed to establish deficient performance or prejudice.

First, defendant testified that he fired his gun in response to being hit with a backpack and punched and then fired again after JS was no longer in defendant's immediate presence. This testimony from defendant as to his conduct could reasonably be viewed as an overly aggressive and improper response to JS's conduct. Further, defendant testified that he was not bleeding and did not suffer any bruises or broken bones. Defendant also testified that he may have told Nelson not to come to court. Defense counsel, who plainly waived an argument that the court erred by not providing defendant's testimony to the jury, see *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000), may have determined that it was best for the jurors not to review defendant's testimony, parts of which could be deemed inculpatory. We cannot find that trial counsel's performance fell below an objective standard of reasonableness. More importantly, in our view, and assuming deficient performance, defendant has not demonstrated that there exists a reasonable probability that but for counsel's assumed error the result of the proceeding would have been different. There is simply no way to assess whether the jury's inability to review a transcript or video of defendant's testimony was harmful or helpful to defendant. For all that this panel knows, the jury may not have acquitted defendant on the more serious assault charges had they reviewed defendant's trial testimony. Additionally, defendant does not even present a developed argument in his brief on appeal that he actually incurred prejudice. Reversal is unwarranted.

We affirm.

/s/ Jane E. Markey
/s/ Douglas B. Shapiro
/s/ Sima G. Patel